How are you doing, Your Honor? Well, I'd like to reserve five minutes for a Bible study. Five minutes? Very well. Thank you. I'll start off with it. That was a tough act to follow, so I'll do my best. That was some pretty good advocacy. Pay attention to the red light. It will be great. I intend to, Your Honor. Trust me. I don't want to appear any longer than I have to be. My name is Jason Orlando. I'm the attorney for the plaintiff appellant, Anthony Falco, who is seated at the table to the far right, and joined by my colleagues Michael Murphy and John Barba. We're here today on appeal of the district court's decision to dismiss plaintiff's First Amendment and due process claims with prejudice pursuant to a 12B6 motion for failure to state a claim. This dismissal, in plaintiff's opinion, was premature. Discovery had just commenced, and there were factual issues that hadn't been resolved. Let me ask you this question to begin, if I may. Yes. The court used one standard on the First Amendment retaliation with regard to the second amended complaint, and another one with regard to the fourth amended complaint. The one with regard to the fourth amended complaint used the private citizen version, as opposed to the public employee version, which was used in the dismissal of the second amended complaint. Is that one of the errors that you're pressing here today? Your Honor, the errors that we're pressing primarily both with regards to the dismissal of the second amended complaint. Because obviously the standards are different. We're bound by Monroe and Hill and not De Flaminis and Thomas, which is what happened with the fourth amended complaint. So I was just curious, as we start, as we look at what standard to apply, is that part of what you're arguing? Yes, Your Honor. Also, what we're arguing is that the chief, who was a lifelong resident of Hoboken, a citizen of Hoboken, he engaged in several acts of protected activity, which I don't think the district court ever disputed that the speech he engaged in was a protected speech. This speech included political speech, political affiliation, as well as speaking out about issues of public importance. But I think what Judge Greeneway was asking, though, is, is he speaking as a private citizen, or is he speaking as a public employee? Am I understanding you correctly? He's speaking, well, it depends upon the speech. I mean, his political speech, in terms of the candidates he supported and his political affiliations, was as a private citizen. In terms of his speech regarding his criticism of the marriage layoff plan, as well as other public issues, was as a private citizen and a public employee. I mean, in terms of the criticism of the marriage layoff plan for the police officers... Okay, let's take a step back. I'm so sorry. I beg your pardon. I'm going to interrupt you. That's fine. I appreciate that. We've got to kind of get this straight, okay? Because in the explanation that you just had, you kind of touched on a lot of different things. So, here's what I'd like to know. First, should we be looking at this as First Amendment retaliation in the context of private citizen or public employee? I believe it's public employee. Yes? Right. Yes. He was a public employee, but he was also a private citizen of Hoboken. Okay. But he was the chief of police. It's related to, this is an employer-employee relationship. And his speech, he was punished for his speech by his employer. So, what you mean to say is he's a public employee... Correct. ...and doesn't lose his ability to speak freely. So, we have to distinguish what was done in his official capacity and what wasn't. Correct. In that regard, I find the Alexia lawsuit a little strange. He calls it testifying in his official capacity, but his employer wasn't one of the defendants. There's no liability. Was he subpoenaed in that case? Is there any reason to treat this as official speech here? He was subpoenaed, and his employer was one of the defendants. It was the city of Hoboken, and Mayor Zimmer were the defendants in the Alexia case. He was subpoenaed by the plaintiff to testify, and he testified truthfully. Now, in your fourth amending complaint, you described the Alexia case as a discrimination and retaliation lawsuit brought against Zimmer and the city. In the opinion dismissing the second amended complaint, the court described Alexia as a lawsuit brought against Falco and the city. So, you understand our confusion. Right. And that goes to the gist of this, Your Honor, is that this was a 12-v-6 motion, and even under the heightened pleading standards of Iqbal and Twombly, the plaintiff is still entitled to all assumptions that the allegations in this complaint are true. I think that what we're looking for is to make sure we understand that the lawsuit, the Alexia lawsuit, was Alexia versus Hoboken and Zimmer. Is that accurate? Yes. And he was subpoenaed to testify, and he described in his complaint that he was doing so in his official capacity. Well, he was – Is that his allegation in the complaint? Yes. Okay. So, the question then is, how is that part of his typical normal duties when he was testifying in a civil discrimination suit as opposed to a law enforcement effort where one might surmise a police officer would have to testify? How is that in his official capacity? Well, Your Honor is right. It wasn't. It was in part of his official capacity because he was an employee of the city at that time that he testified, and he was the chief of police. His actions that were taken by him as chief of police were mentioned in the complaint, in the Alexia complaint. But Your Honor is right because unlike in Garcetti, where it involved a memorandum, the Garcetti Supreme Court case involving the internal memorandum that was written at the request of a superior, this was not a normal police officer testifying about a burglary or a homicide. This was something different. This was him being called to testify, and really the testimony actually ended up being about his allegations in this case regarding the mayor's retaliatory motives and retaliatory retaliation against people that are not part of our political team. So his testimony in Alexia was outside of his job duties? Is that the way we should look at it? Yes. He was a public employee, and he was there because of that, but it was outside of his normal duties. Normally the chief of police doesn't testify against the city of Hoboken or the mayor with regards to the mayor's proclivities towards retaliation. So we're supposed to ignore your allegation where I think it said something like he testified in his official capacity? Because you've asked us to accept the allegations as true. Yes, Your Honor. I'm having a hard time understanding the significance of that point because of the Garcetti case in which even if something is done, Garcetti doesn't preclude free speech or First Amendment speech for public employees, even if they're talking about things that are related to their job or information that they've learned as public employees, and that's what the chief was doing. There's a number of other allegations in this complaint, many of which predate any kind of lawsuit compensation. If we find everything that's before 2013 as unprotected and all we have left is the Alexia testimony and the filing of this action, do you have a claim? Yes. And what's the theory of how his testimony and the filing of this lawsuit will assume both are protected activities lead to some kind of retaliation? What do we have besides a causal connection between or a causal time frame, sorry, not causal, but a time frame that's close between the Alexia testimony in March and the court standby time in December? Well, it actually… All right, I flipped those dates. Forgive me. Yes, it was the Alexia testimony in December. And the court standby time in December. And the court standby time was taken in January. Do you have anything other than the fact that they're close in time for us to infer that the loss of the court standby time compensation was in retaliation for his testimony? Or do we only have the proximity of the time? The proximity of the time. I would just point out here, Your Honor, we discussed this a lot in our briefs. Counselor, don't you also have his campaigning for the mayoral opponent in 2013? Yes, we do. Is there an allegation that she knew about that, that Mayor Zimmer knew about his campaigning? Is there anything in the complaint that we could confirm that she knew about his campaign? In town on Cobolken, particularly when you have the chief of police who – everybody knows everybody's politics. This is a nonpartisan election, similar to Patterson, similar to Jersey City, similar to Newark. Chief Falco is a prominent member of the political faction of Old Cobolken. That's a political faction? I thought that was a demographic faction. No, it's a political faction within the context of Cobolken. People don't run as Democrats or Republicans. They run as, you know, in a nonpartisan way. That doesn't mean they're still unbind together or somehow identify themselves. And Chief Falco was part of the group that identified as Old Cobolken. In 2009, when Mayor Zimmer first ran for elected office, Chief Falco at that time was captain in the police department. He was a member of the union. The union took the unprecedented step of endorsing Mayor Zimmer's opponent in that election. The union held rallies for Peter Kavanaugh. Is that in the complaint? I don't know. It's something that we learned. If it's not in the complaint, we can't consider it, right? Well, I mean, that was the point that were in your honor, was that this was prematurely dismissed. This was dismissed before we were able to conduct discovery and before we were able to fully, you know, expand it on the record. And the same thing with the idea of this proximate cause. I mean, this circuit has repeatedly said, and we talk about this in the complaint or in our, I'm sorry, in our brief, that has repeatedly said that, you know, proximity, temporal proximity is not essential for a pleading. In the pleading, and it's not even necessary once the whole record is up. You're absolutely right as a matter of law. But the point that Judge Schwartz was making is most of the speech you're talking about preceded by a considerable time any alleged or noted retaliation. And that's the problem. That's not accurate, your honor. That's one of the mistakes that the district court made. Tell us. The district court, beginning upon, I mean, part of this goes back to the circumstances of the chief's appointment as chief and the mayor's assumption to the office of mayor. Again, as I began to say, there was a nonpartisan election, which was resolved, I believe, in June, early June of 2009. At that time, the city of Hoboken was under state fiscal monitorship. And there was a dispute as to who should be able to appoint the chief, whether it should be the city or the state. The city at that time was Mayor Roberts. Mayor Roberts' protégé was Peter Camerato, who was running for mayor. Both Roberts and Camerato wanted Falco to be chief. And that's who the state of New Jersey appointed, right? Oh, no. If I could just finish, your honor. The state at that time wanted a different chief. They wanted another captain. Is that in the complaint? It is in the complaint about the circumstances regarding Camerato. Right. And there was opposition to it. So, eventually, Camerato wins the election. He becomes the mayor on July 1st. Chief, the state addresses to his wishes that Falco become chief. Falco becomes chief in mid-June. Two, three weeks after becoming mayor, Camerato resigns as a result of his involvement in Operation Bittrig. And Zimmer, who was the council president, who was defeated by Camerato in the mayoral election, and who opposed, as a council person, the appointment of Falco as chief, is elevated. Under that time, the retaliation you're talking about is the monetary retaliation. At the time, the state was still in control of the city's finances. Falco received everything in what is called the PSOA, the Police Superior Officers Association Agreement. That was his understanding upon accepting the role of chief, that he would receive that. The district court said that any of that was a unilateral understanding. Therefore, it didn't constitute a property interest. Are you leaving speech and going to property now? No. Because you're talking about retaliation. So, the retaliation you seem to be focused on is the monetary retaliation. That's what you alleged in your complaint. We also alleged he was engaged in a pattern of harassment from the administration. Beginning upon the mayor's ascendancy to become acting council president, he was subjected to a systematic pattern of retaliation, of adverse employment actions, of repeated interference in the daily operations of the police department, of being excluded from meetings, of not being consulted as to regards with this layoff plan. Those are the allegations in the complaint. So, the retaliation took many different forms. It wasn't just the monetary retaliation. The monetary retaliation happened in 2012. Now, what is important about that, going back to the state fiscal monitorship, is that the state monitorship didn't end until 2010. These stipends are paid once a year. So, he received them in 2009-2010 while the state fiscal monitorship was still ongoing. In 2011, a VA, Chris Archliston, was hired at the behest of the state. He came in. He specializes in distressed cities, taking cities that are under some sort of state fiscal monitorship and getting them independent. Archliston comes in. He pays. He approves payment for the chief's stipends. In 2012, Liston's gone. Zuber has replaced her VA, has replaced a new director of public safety. And those individuals, they decide to take away, for the first time, Falco's stipends. So, there is a nexus and there is a proximity. In the interim, Falco has continued to engage in protective activities. He, you know, opposes the May 2009 election. The mayor, from becoming council president to mayor, leaves open a seat on the council. There's a special election in which the council has power. I hate to keep asking this. Is any of that in the complaint? Your Honor, this was all developed during the limited discussion that was conducted after the campaign. The council, we are a court of limited jurisdiction on a particular issue. And in front of us today is whether or not the district court properly granted a motion to dismiss under Rule 12b-6, which only limited Her Honor to considering the complaints in front of her. We can't consider anything more than Her Honor was considering. So, that's why I hate to keep asking that. But if it's not in the complaint, it's not within bounds for our consideration. It is in the complaint, Your Honor. The allegations regarding You just said to me, though, that things have been developed after the complaint. Some of the stuff has, yes, Your Honor. But, as any case, you learn more about the case. That's why you have discovery. I mean, the standards that Judge Osler applied to us in this case have basically put forth your whole case in pleading. And, you know, Well, we've looked at your pleading. You're pleading mushroomed into all kinds of things. The first mention of some of the political support issues that I think my colleague Judge Bevis mentioned, the first time it was mentioned was in the Fourth Amendment complaint. So, it's clear that there was a development over time. We're looking at the most recent pleading, which is the Fourth Amendment complaint, to the extent you're asking us to reinstate that. And then you have some arguments concerning the Second Amendment complaint. And those are the only factual allegations we can look at. Well, Your Honor, the political, the chief's power-taking was mentioned in the Second Amendment complaint. But I don't think the 2013 episode was. It doesn't matter. My point is, when you're arguing about the facts, if we could stay focused on the facts, the only ones that we're allowed to consider, that would be helpful. Because we want to be able to understand whether those events, as alleged, are protected. And if they are protected, was there a consequence for engaging in that activity? That's really the test that we need to look at. Well, they were alleged, Your Honor, and there was a consequence to Chief Falco. Can you tell us the absolute best instance of speech that resulted in retaliation that's in the complaint? Yes, Your Honor. The chief's support of political opponents opposed to the mayor. And, I mean, I don't know if I can choose the best. It's like trying to choose between your children. There's multiple instances in which he was retaliated for. It's not like your kids. I would say his political affiliations, Your Honor, which were alleged in the Second Amendment complaint, the third and the fourth, and his work in those elections. So his support of Ramos? I just want to make sure. His support of Ramos and his support of Achapinto? Achapinto, yes. So that's what you're saying were the events of his best arguments about protected activity, correct? Your Honor, I mean, again, I'm going to choose one that's the best because he also testified in open court, pursuant to the subpoena, truthfully, about his membership in Old Hoboken, about the marriage discrimination against Old Hoboken. That's his political affiliation, and he was retaliated against that by having his stipend taken away. That's the clearest temporal nexus, if that's what Your Honors are going for. But in terms of, you know, from the day Zimmer assumed the mayorship, there was a campaign and pattern of retaliatory acts engaged against Chief, which escalated throughout, and which culminated with the failure to pay him his retirement, his payment upon retirement, which he had earned for 42 years of service as a Chief of Police, as a police officer. Thank you. We'll get you back on. All right. Thank you. Thank you. Good afternoon. Do you pronounce your name Afanador? Afanador. Good afternoon. May it please the Court, Victor Afanador, from the law firm of White, DePalma, Greenberg,  This case is about the appellant's repeated failure to plead a cognizable cause of action under the First Amendment, after not once, but after five times. So let me ask you this question. In your brief, you rely on defaminas for the elements of the First Amendment retaliation, but that case applies to a First Amendment retaliation brought by, but it doesn't apply to a First Amendment retaliation claim brought by a public employee. Should we look to that or Monroe? Monroe deals with the public employee, so I'm a little confused. Two different standards were made, one was second, and now you have defaminas now. Help us. I understand, Your Honor, and hopefully I can clarify. We rely, our position is that Chief Falco was operating as a public employee in all of the speech that he conducted, all of the allegations. We believe that the Savarro-Garcetti line of cases, the progeny, Monroe and Third Circuit, that's the proper standard. Okay, so it is Monroe. Part of the confusion lies because of the repeated attempts to correct the deficient pleadings. As Judge Schwartz has pointed out, this complaint was originally a 42-count complaint with state causes of action and various 1983 federal causes of action. It ultimately ended up into a one-count complaint under the First Amendment with 225 separate paragraphs. Maybe we can clarify this by taking it step by step. It looks to me like there's a bunch of predicted activity that extends past 2010. You don't dispute that the campaigning for Bocchipinti and the rallies that extend into 2011, that that's protected conduct, correct? No, Your Honor, that would not be protected conduct because it would be politicking. We believe that... You dispute that, you say that an employee, a public employee loses his rights to campaign for someone on the other side of the mayoral election? No, Your Honor, we're not saying that. I believe that our arguments in all of our submissions to the district court and in the Third Circuit submissions are that there is no temporal connection. No, no, that's a causation issue. Yes. I want to focus in on what are protected acts before we get to causation. So campaigning for Bocchipinti is protected. Yes. And that extends to May 2011. Yes. The criticism of the St. Patty's Day parade from the end of 2011, St. Patty's Day would be what, March 2012? Yes, Your Honor. So that's protected conduct too? No, it would not be, Your Honor, and that is where we believe. We've identified eight points. I believe at the outset of our Third Circuit brief, we try to categorize this, I believe it's page 14, one of which is the St. Patrick's Day parade. We believe that's well within the Chief's commentary in his job duties and functions as Chief of the Police Department. We rely upon NJSA 40A 14-118, which is the Chief's Bill of Rights, which identifies all of his job duties and functions. Commentary on public safety and the St. Patrick's Day parade would fall well within his job duties and functions, and therefore it would not be protected. Is that something that, but don't we have to take the complaint on its face value? You think this is a matter that can be resolved in a 12B6? Absolutely, Your Honor, because the reliance on the Chief's Bill of Rights is within the Fourth Amendment complaint, amended complaint, it's there. And the allegation that he commented on this, it's clearly within his job duties and functions. If we look at administering, enforcing rules and regulations, exercising, discharging of functions, police duties, assignment, that's purely within the Chief's Bill of Rights under 40A-14-118, and would not be protected activity by Chief Falco. You don't dispute that filing this suit in March 2013 is protected activity? No, we would argue the causal connection, that it would be causally connected, and because of the timing. You don't dispute the campaigning for Zimmer's opponent, is that Ramos, in 2013, that that's protected activity? No, we do not dispute that. That would be an exercise in political activities, Your Honor. All right, that's protected. And now you have a difference of opinion on Alisaia? I don't know how you pronounce it. Yeah, Alisaia. Our view of Alisaia, and what happened at that point in time, is distinct from Lane v. Franks. And what I address for the Court is footnote 14 of that Supreme Court decision, which says this Court is not saying that when an individual, within his job duties and functions, is authorized or could be directed to testify as part of his job duties and functions, that's not what Lane governs. But he's not testifying for the defense. He's not testifying for his employer. He's subpoenaed. He's testifying for Alisaia on the other side of the V. Your Honor, I disagree. In the complaint, the last complaint, the Fourth Amendment complaint, there's an admission there that he was called to testify in his capacity as chief. One of the interesting things that maybe did not come out in the pleadings is Alisaia was the public safety director for the city of Hoboken. So you have a public safety director for the city of Hoboken calling to the stand the chief of the police department in order to elicit testimony regarding his job duties and functions. That is not beyond the scope of the four corners of the complaint. That's within the complaint. And based upon that, if we tie in Lane v. Franks, we're dealing with unprotected activity because he was called to the stand pursuant to his job duties and functions. We think, Your Honor, that this falls well within the Third Circuit cases like De Redis, in which we had a very novel situation where a public defender was seen not to have acted with protection when he spoke in court, chitter-chattering with judges, with lawyers about why he was reassigned. If in De Redis, this court found that that was not protected activity, well, that's more of an overt act. Let's talk about causation now. You've conceded there's at least protected activity until May 2011, and there's alleged retaliation in 2012. And you've conceded protected activity in 2013, and there's alleged retaliation in 2014. And yet you say it's not proximate enough. Well, we have a precedent, Connolly v. Lane, that says if the first opportunity to inflict some kind of retaliation comes later at an annual benefits review or something, that can explain why there was a delay of months. And we have alleged before us that Tooke was hired in August 2011, that he had the idea for cutting the benefits, the uniform, the testimony stipend, etc. And then at the next possible opportunity, the following January, is when Zimmer, your client, allegedly denied the pay raise, denied the uniform, these other things. So just as a matter of temporal proximity, I don't see how this delay of less than a year, we can say that that doesn't cut it for an allegation of causation. Your Honor, I disagree with how Connolly is being interpreted. Connolly, I do agree with Your Honor, it does stand for that proposition. But if we look at that case, in that case, what the court did is it analyzed each of these elements, each of these allegations of protected speech or unprotected speech, and allegations of retaliation. And they systematically, this court systematically went through all of them. Our position is, notwithstanding the footnote, which is footnote 7, I apologize if it's footnote 7. But notwithstanding that footnote and the ultimate determination that came down by the third circuit in Connolly, there was an analysis there, and not all of those incidents were founded incidents by the court. So we believe that there still is no causal nexus. My co-counsel will properly and more articulately address all of the nexus arguments, which may also lead into answering that question, Judge Bittes. But with that, we believe that this case is clearly a case of protected activity. I would like to say just one other thing with respect to any reliance upon the Heffernan case. Heffernan was utilized in this case by Pelham's counsel to establish the chilling effect that speech could have upon other public employees. Heffernan is inapplicable for various reasons. One, it's purely an association case. In that case, the plaintiff never spoke. Is it your understanding that their association case has fallen by the wayside at this point? I believe so, Your Honor. There's two – no, no, Your Honor. I believe that they're still distinct. There's two runs of cases. No, no, no. They're not being fallen by wayside. Abandoned, essentially. I hope that's true, Your Honor. But we have a speech case in front of us. This is not an association case. I agree, Your Honor. I believe we've submitted that in our submissions. This is a speech case. This is not an association case. And therefore, Heffernan is inapplicable, and the facts have no bearing upon this case. Was the district court correct when the district court looked at Mr. Falco's response to the alleged events by saying he clearly wasn't chilled because he continued to speak? Would you say – would you concede that that probably was the wrong perspective when you're supposed to look at the impact on the ordinary person? Your Honor, I believe that there are other reasons for justifying the district court's decision. I do find strong credibility and agree with the idea that it clearly does show, while it's not the proper standard, it does highlight the ultimate issue in many of these First Amendment cases, which is, is speech chilled? You can't look at it sort of in a vacuum, right? Speech can be chilled in many ways. I mean, the sole metric can't be, was the person talking less or more, right? You have to measure, okay, it seems like it was just as much, it seems like it was more, but you never know whether, in fact, the retaliation or the action taken against them didn't interfere even more than you can imagine or more than can be reasonably inferred. Do you agree with that proposition? I would agree, Your Honor. Unless the court has any... I have one other question. The district court, in deciding that there was no retaliation as a result of the court's standby pay, was her view that was de minimis. And with respect to the payment upon retirement, that describing it as it was substantially less than expected is also too vague. We're supposed to give all inferences to the benefit of a plaintiff. How can, what's your best argument to defend the district court for making that statement and really putting inference to the defendants? My best argument for upholding the district court's decision on de minimis retaliation is Brendan v. Norton, which is a Third Circuit case, Roseberry v. Philly, and Connelly Lane as well, because in all of those cases, the Third Circuit does pick apart each and every single act of speech in the retaliation. And while in some cases I do acknowledge you can have a lot of incidents rise up to being a valid cause of action, in all those Third Circuit cases, there is a parceling out and a dissection of the retaliation and the speech. And I believe that that provides the district court and provides us with having that decision upheld. Thank you, Your Honor. Thank you. May it please the court, esteemed judges, I'm Tom Abraham. I'm here on behalf of the city of Hoboken and former public safety director John Took. In the event that the court finds that there are a lot more instances of protected free speech, and again, I think the court is trying to narrow whether we're talking free speech, political association, I too believe political association has fallen by the wayside, then I'm here to argue, A, that there's no proof, plausibly pleaded, of adverse acts sufficient to allow the case to go forward and that the district court was correct in that regard. And secondly, I'll deal with causal connection and Judge Bevis' concerns. The adverse actions that we're talking about here are clearly de minimis. Appellant's appellant argued that the judge considered each one in isolation and not cumulatively. We have put excerpts in our brief to show that the judge did consider them both in isolation and cumulatively. So that is not a problem. And again, the court has brought up the issue of whether or not the alleged acts were sufficient to deter a person of ordinary firmness. In other words, the chilling effect of that. And my clue castle has spoken to that. The district court's reasoning seemed to be, well, he wasn't deterred and it wouldn't deter a reasonable chief of police with no citation as to why the standard is a reasonable grizzled chief of police versus a reasonable ordinary person. Part of it was it wasn't deterred and part of it was what we're talking about here are basically de minimis. What we're talking about is a man who was making $186,000 a year and is talking about a $500 stipend. Which, by the way, he got it from 2009 to 2011 and it was finally in 2012 that a new sheriff arrived in town and said, why are we giving him $186,000? So you are not disputing that the thousands of dollars denied in 2012 would be sufficient to deter a reasonable person of ordinary firmness? Well, what you're talking about over from 2012 to 2014 when he retired is $8,000. We're not talking. And yes, is that thousands of dollars? Yes, but that's not $400,000 or a million. That's what we're talking about. And we're talking about somebody that spoke out on every opportunity that he had. But again, I believe that the proofs are such and the district court correctly found that there was no chilling effect. And is it based primarily on the fact that the chief continued to speak out? Going down that hindsight road proves lots of dangers. There's not chilling when someone, in fact, winds up speaking. But again, you analyze the adverse acts and, for instance, the $500 for a standby time. Again, that's a payment of overtime. So if somebody looks at that and says, you're a manager, you're now the chief, you don't get that anymore, that's diminished. And that's what the court, the district court found. We don't have a justification. Again, much like I said to your adversary, based on the complaint, we don't know what his salary was. You just mentioned it. But it's not in the complaint. And with respect to the amount of the standby pay, there is some case law that suggests it's not just whether it's going to chill this individual who happens to be well paid. It may chill a junior officer who is not as well paid, and $500 for that may be meaningful. The adverse acts are primarily compensation related. But bear in mind that when your honors look at the complaint, the complaint also said that there were three separate New Jersey statutes that were violated. The court looked at each one of those statutes and it started first with 4814198, which is not always referred to as the chief's bill of rights. What it is, it tells the appropriate authority, which in this case was the mayor. It tells the appropriate authority what the chief's duties are. It prescribes the chief's duties. It doesn't create a private clause of action, nor are there benefits that are outlined in 4814198. But you're kind of deviating into the property, the due process property claim. And I think we're still focused on the First Amendment. The First Amendment does not require a protectable property interest. It can fail the due process inquiry and still satisfy retaliation for the First Amendment. And it must have a reason not to address the due process. Don't get into due process. But your argument sounds like an argument that would be well put to the due process argument, but it doesn't really belong here in the First Amendment context. That's kind of what the argument is. And again, what we're talking about are stipends here. We're talking about stipends that appeal by comparison to the base salary that the gentleman received. We don't have that in the complaint, sir. We don't have a figure of comparison. And I'd like to ask you about one of the allegations of retaliatory act was alleged deprivation of the payment upon retirement that was, in the complaint language, substantial. The district court found that to be vague. And I ask you to answer the same question. Are we duty bound to construe that in favor of the plaintiff on substantiality? I disagree with that. And the payment upon retirement is based in part upon the claim that I should have received an annual 2% raise each year during a period of time that I was the chief. I know that from the complaint. The district court dealt with that issue in dismissing the Second Amendment complaint. She said that none of these statutes provide the chief with an annual raise. If the chief doesn't receive an annual raise, then that claim is eviscerated. And that's the argument that we made. And that was the argument that was briefed. And the court agreed with that. The bottom line is that he doesn't have a contractual claim to annual raises. Therefore, the payment upon retirement that he thought he was going to get at the end of the day was based upon what the bar chiefs got. It doesn't have to be contractual. I mean, contractual would suffice. It wouldn't be necessary here. If there were just a norm of expectation of getting a 2% raise. Well, we dealt with that in point 2, which you told me not to argue. But the Marine case and the Haley case, one of which is a third circuit case, both of those cases stand for the proposition that if it's not in writing. Bear in mind, if it's not in writing, there's no procedure to process claim. I get that. But if it's not in writing and there's no contract, there's no claim. But I think for First Amendment purposes, that's not. I believe that the district court correctly found that that expectation was tenuous on his part. And that was part of the paradigm that she, that the district judge, looked at and considered when the district judge concluded there were no adverse acts. So you're saying that because there was no legitimate expectation to a certain amount of payment upon retirement, it could not have been an adverse action? Exactly. In other words, not everybody is going to get the same as their predecessor, or two predecessors, or three predecessors back. And in some of the cases that I defend, somebody says, the city manager or some other person told me this is what I would get after I put my four or five years in as chief. We don't have that in this case. We just have what's pleaded. And we do have an allegation that every other cop got an employment contract. And he wasn't getting an employment contract for the last few years, right? And they cited statutes to your honor for the proposition that we're not entitled to a contract. And the district judge found those statutes didn't apply. So the bottom line is that there is no case law that says that a chief is entitled to a contract. Does it happen? For a small percentage of chiefs, they get contracts. But they're not required to get contracts. And that's how the district judge dealt with that. That is something that was dismissed either the first time around, the second time around, or clearly the fourth time around. I'm going to now move to causal connection. Because causal connection is the key to the argument that we're making here. Because even if there's a protected act, and even if there's protected speech and an adverse act, we submit that there's no causal connection. And again, what we're dealing with is temporal proximity, which Judge Bevis first brought up. So focus in on that. The Connelly v. Lane, the annual point. We have conceded that there's some causal, some protected activity that's within, that's the previous year before some of these. Well, let me just say this. The claim that he worked on the Reynolds campaign in 2013 is a reach. I'm not sure that that complaint, that claim, was articulated in a Fourth Amendment complaint. What they were dealing with in the Fourth Amendment complaint was the election that took place in 2009, where Calabro was elected, subsequently indicted and resigned. We were talking about some events that took place in 2010. And by the way, we haven't even talked about his interference claims, which are now Whistleblower claims, which, by the way, were litigated in a companion state case. We have campaigning for occupancy through May 2011, which you're acting. You don't dispute the co-counsel. We don't dispute that. August 2011, we have Took comes on board. Took is alleged to have given Zimmer the idea that you can deny benefits at the next annual review. And indeed, the first half of the next year, there's what, no uniform stipends, no pay raise. The singlies incentive are diminished. Doesn't get a contract. Can I just correct you on that? With respect to the pay raise, there never was a pay raise, except one year, when because of his base salary, there was a perception that perhaps somebody else's base salary would be higher. So he did get the raise. Of the five years that he was there, he got a 2% raise one year. We have to take these allegations. I'm sorry. Those are given. And the allegations are that the next opportunity, the next calendar year, Zimmer denies this after Took has suggested the idea. So why isn't that enough of a causal story to survive a motion to dismiss? Maybe they fall apart in discovery or maybe not. Because the two stipends that you just mentioned, one is $500 and one is $400. So there's only about $900 worth of stipends. There's $1,300 for uniforms. There's $1,500 for sick leave and attendance incentive. And then there's the 2% pay raise, which is it pleaded well enough or not? It seems like it's a pleading issue. The 2% was not. The way the 2% was pleaded was understandable to the district court judge. She understood that there was a statute that said that if somebody else's base salary was going to be the same, he deserved the raise. And he did, in fact, get that raise that one time. But the pleading doesn't say that he was entitled to the 2% raise those other years. The pleading says that my compensation was reduced because of the stipends. All right. So the $1,500, $1,300, you're asking us to say that we can find that thousands of dollars in compensation are still de minimis. Yes. You're off the causal point now. You're not fighting my causal point. I think from a causal standpoint, temporal proximity, the temporal proximity analysis is unusually suggestive conduct that would suggest retaliation. It happens to one side on his mom's law, and then the next day he gets transferred. Well, here we have the FCA testimony, and the next month we have no more stand-by pay for you. That's a pretty tight causal connection. It may not be the next day. That's something we cannot dispute. We say that there's no causal connection there. In other words, a list arrived, and his name got taken off the list because he's the chief, and it was considered to be overdone. But we have three causal tests. There's the unusually suggestive temporal proximity, I will say, of very close in time. Then we have, for me, it's a pattern of antagonism coupled correctly. Right? And this is still relevant, or we can look at whether there's a record evidence as a whole. So it doesn't have to be right next to it. That's just one way this can be proven. So why is it that you don't think that the pattern of antagonism, because when you analyze the alleged retaliation, it falls by the wayside. When you look at the St. Patrick's Day Parade, it's not a protected act. When you look at the alleged interference, the district court judge clearly found it was interference with the police department, not with Falco as a chief. When you look at each one of those events, with the exception, perhaps, of the Aliseo trial, each one of those falls by the wayside. When you look at the claim that because he made Father Santoro the police chaplain, that was a protected act. There's no reason to say it's a protected act. It's not protected. But this pattern of antagonism doesn't require that each item in the pattern of antagonism be protected. Father Santoro, unprotected, fine. You guys dispute the St. Patrick's Day Parade, you dispute a couple of items here, but they can still contribute to the pattern of antagonism, can't they? I think the district judge said there's no pattern of antagonism because there's no provable retaliation. There's no plausibly provable retaliation. So that's why that curves as well. And then when you add to that the temporal proximity case law, which says it really should be closed. I understand, and I know that Your Honor is accurate, that it has been extended somewhat. But when you look at that case law, and again, it's also a subjective test. We have to know that we're violating rights at that point in time. And I would suggest that the case that Your Honor was relying upon is a recent case that we would not know about at that point in time. So your ruling is qualified immunity for your individual client? Is that why you just said that? I don't think there are arguments necessarily on that, but I just want to know that's why you said that. Not only is it for qualified immunity in regard to what we've briefed, but also lame versus facts. And lame versus facts. That employer, that individual who was in charge, he received qualified immunity. So that person took and deserves qualified immunity. All right. Thank you so much. Thank you. Just a couple of points to follow up there. One is this idea, going back to what Judge Schwartz was asking about regarding the allegations in the second amendment complaint, paragraphs 12 and 61 and 63 all contain allegations regarding Chief Falco's political affiliations. And this idea also that the political affiliation claim has been banned, that's not accurate. It was plotted in the second amendment complaint. Judge Schwartz. Before us, though, I don't remember seeing any case law that were political affiliation cases. All the case law, as I understand it, I'm happy to be corrected, were speech cases. Well, Your Honor, I mean, we cited it repeatedly in our brief to this Court as well as to the District Court. But for what purpose were you citing Heffernan? Well, that the Chief is punished for his political affiliations. And what political affiliations are you saying? Are you relying on Ramos and Occipinto? And Roberts and O'Rourke. Okay. So your position is you have a political affiliation claim. Yes. Yes, Your Honor. Are you looking for us to reinstate counts 25 through 31 of the second amendment complaint and the whole fourth amendment complaint? Or are you looking for us to reinstate just the fourth amendment complaint? I'm not sure. Forget the privately due process claims for the moment, just on the first amendment claim. Right. We're looking to have reinstated all of the first amendment claims in the second amendment complaint as well as the due process claims in the second amendment complaint. And what about the fourth amendment complaint? Are you foregoing that? Well, the fourth amendment complaint was a first amendment claim. We would want that. That sort of survived basically when we were able to piece together. It had survived because the second amendment complaint dismissed most of the counts with prejudice. There was a few that survived without prejudice, and we replanted them. The third amendment complaint and the fourth were just in one count because we were trying to decide what had been and discern what had been dismissed without prejudice and what had not. We put it all in one count. So the free association claim is out or it's in? No, it's in, Your Honor. It was dismissed in the second amendment complaint, but we're not abandoning it. In fact, we plead it again in paragraph 225 of the fourth amendment complaint, and we believe this is a political association case. 225, isn't that the one that says first amendment free speech? 225 says defendant's actions unlawfully interfered with plaintiff's authority over the operation of the HPD and deprived plaintiff of compensation because of, among other things, political views and or affiliations. So we're still pleading it, Your Honor. And we believe the plaintiff engaged in a variety of protected activity, as the back and forth between Your Honors and myself and Your Honors and my adversaries indicates. There was a pattern of protected speech that was engaged in here, whether it was his active participation in campaigns or his just affiliation with those campaigns. That's all protected activity. He was punished for that. So I just wanted to clarify that. With respect to, again, to this idea that taking the money, even $500 being de minimis, again, I don't think there's any support for that in the law, that $500 as a matter of law is a de minimis amount. And I would posit that it is not. And after that, the Supreme Court, again, this is the Supreme Court. This isn't just a random precedent. This is the United States Supreme Court ruling on a case that arose out of this district and this circuit. It said we don't require plaintiffs in political affiliation cases to prove that they or other employees have been coerced into changing either actually or ostensibly their political allegiance. So, again, this goes to the chilling argument. What case? He doesn't have to prove it. He became a Zimmer supporter. He can continue to exercise his constitutional right to support the candidates of his choosing and to affiliate with the political groups of his choosing. And, again, Heffernan is instructive. It's why we cite it. At one point, I think we cited it 26 times to the district court. The district court didn't address it or distinguish it at all. The Heffernan was a police officer whose job responsibilities were changed. He was taken from the chief's office and put on the walking post. He wasn't denied stipends, like the plaintiff, and nor was he demoted. His job responsibilities were changed. He wasn't entitled to work in the chief's office. This whole idea, as Judge Bebas, I think, accurately questioned Mr. Hanrahan about, that there's a difference between entitlement and adverse employment action. You can suffer an adverse employment action without being entitled to something. So I wanted to comment on that. Again, Circuit in Brennan v. Norton, 380 F. 3rd, 399, said that retaliatory acts must be viewed cumulatively or in the aggregate. And here's a quote. The cumulative impact of retaliatory acts may become actionable even though the actions will be de minimis if considered in isolation. Same sentiment in Supong v. Dodonna. An entire campaign of harassing, which, though trivial in detail, may have been substantial and gross, is a question of fact whether the campaign reached the threshold of actionability under Section 1983. Connolly v. Lane, which has been discussed a lot during this argument. Again, a quote. No showing of proof is necessary at this stage of the proceedings, which the quote is referring to the pleadings. But even if the record ultimately produced no evidence of temporal proximity suggested for retaliation, that would not necessarily be fatal to plaintiff's claim. So, again, the issue of causation is a factual question. This case should have been able to proceed through discovery and ultimately to a trial and a verdict. All right, thank you.